MAIN, Justice.
Alamo Title Company (“Alamo”), a Texas corporation, petitions this Court for a writ of mandamus directing the Jefferson Circuit Court to vacate its order denying Alamo’s motion to dismiss an action filed against it by P.B. Surf, Ltd. (“P.B. Surf”), a Florida limited partnership, and to enter an order dismissing the action for lack of personal jurisdiction. We grant the petition and issue the writ.

I. Factual Background and Procedural History

This dispute concerns the disbursement of proceeds from the sale of the San Palo-ma apartment complex in Houston, Texas. According to P.B. Surf, at the time the San Paloma sale was scheduled to close in late October 2011, a dispute arose over who was entitled to the net proceeds of the sale and where the net proceeds were to be deposited after the closing. On October 28, 2011, after the closing, Alamo wired a portion of the net proceeds from the San Paloma sale to a Birmingham Wells Fargo bank account pursuant to instructions from several of the sellers.
P.B. Surf filed a verified complaint against Alamo, as the escrow agent, and several other defendants, alleging, among other things, conspiracy. Alamo moved the trial court, pursuant to Rule 12(b)(2), Ala. R. Civ. P., to dismiss P.B. Surfs claims against it for lack of personal jurisdiction, attaching to its motion the affidavit of David Pitschmann, the senior vice president and co-general counsel for Alamo. Before the trial court ruled on Alamo’s motion to dismiss, P.B. Surf filed an amended complaint, which was not verified, alleging various claims against Alamo, as the escrow agent, and several other defendants, including Guy A. Savage, and G.J. Willem Noltes, who both had an ownership interest in one of the companies that was involved in the sale of the San Paloma apartment complex, alleging that there was a conspiracy among the defendants in the wiring of funds from Alamo to the Birmingham Wells Fargo bank account. In its amended complaint, P.B. Surf alleged that Alamo was partially responsible for what it alleged was the improper distribution of the proceeds among Savage, Noltes, and P.B. Surf. The amended complaint contains the following factual averments:
“15. P.B. Surf is a limited partnership operated by David A. Brannen and other partners.
“16. Investment Realty Holdings, LLC is jointly owned by Savage and Noltes, each owning a fifty percent (50%) interest in the entity.
“17. P.B. Surf and Investment Realty Holdings, LLC are the only members of Investment Realty Series II, LLC (‘IRS-II’). P.B. Surf owns a sixty-percent (60%) interest in IRS-II, and Investment Realty Holdings, LLC owns the remaining forty-percent (40%) interest in IRS-II. P.B. Surf provided the only capital used to create the entity, investing approximately $5,900,000.00 in cash. Investment Realty Holdings, LLC, Savage and Noltes did not provide any equity contribution to IRS-II.
“18. In February 2007, P.B. Surf and Investment Realty Holdings, LLC entered into an Operating Agreement to govern the operation of IRS-II. That agreement controls and governs the parties’ relationship with respect to all business matters as it relates to the operation of the San Paloma property, the sale of which forms the basis of the present dispute between the parties.
“19. The IRS-II Operating Agreement provides that P.B. Surf made the only cash contribution to the entity. Further, the Operating Agreement provides that, upon the sale of the San *703 Paloma property, which is considered a ‘Capital Transaction’, all monies are to be distributed as follows: first, an 11% return on its approximate $5.9 million investment was to be paid to P.B. Surf; second, P.B. Surf was entitled to a full repayment of its approximate $5.9 million investment; third, only after P.B. Surf had been paid both of these sums, any remaining funds were to be allocated between P.B. Surf and [Investment Realty Holdings, LLC,] according to their respective interests in IRS-II, such that P.B. Surf would receive 60% and [Investment Realty Holdings, LLC,] would receive 40% of any remaining amount.
“20. IRS-II then entered into a contract with WCSE San Paloma, LLC whereby they created San Paloma Investments, LLC. Each entity held a fifty-percent (50%) interest in San Paloma Investments, LLC.
“21. San Paloma Investments, LLC then entered into a partnership agreement with Paloma General Partner, LLC, creating San Paloma Partners, L.P. San Paloma Investments, LLC was a ninety-nine percent (99%) limited partner in the entity, with Paloma General Partner, LLC acting as a one percent (1%) general partner.
“22. San Paloma Partners, L.P. was created to, and did in fact, purchase, own, and operate certain real property located in Texas referred to by the parties as ‘San Paloma.’ The sale of this property in October 2011 and the subsequent distribution of the sales proceeds are the subject of this lawsuit.

“The Closing of San Paloma

“23. The San Paloma deal resulted in substantial financial loss to P.B. Surf, which had contributed the entire capital amount (approximately $5.9 million) used to purchase San Paloma.
“24. On or about July 27, 2011, San Paloma Partners entered into a purchase and sale agreement with ISBI San Paloma, LLC, successor-by-assignment to Francis Property Management, Inc. (‘ISBI’), whereby San Paloma Partners agreed to sell the San Paloma property to ISBI (the ‘San Paloma Sale’). P.B. Surfs consent was required to sell the San Paloma property, as provided for in the IRS-II Operating Agreement.
“25. As a result of the San Paloma Sale, P.B. Surf stood to realize a loss of more than $5 million.
“26. On October 27, 2011, the San Paloma Sale was scheduled to close. Over the course of the day, due to Defendant Noltes, a dispute arose over who was entitled to the net proceeds of the sale and where the net proceeds were to be deposited after the sale closed.
“27. During the afternoon of October 27, 2011, P.B. Surf and Savage, through their attorney Patrick Hayes, consistently maintained that P.B. Surf was entitled to receive the entire net proceeds from the San Paloma Sale based on the relevant operating agreements, as provided above. The sale resulted in approximately $3.8 million in net proceeds, held in two portions: (1) $1,561,704.80 was held by Grandbridge Real Estate Capital, LLC, and is not the subject of this lawsuit, and (2) $2,277,057.08 was held in escrow by Alamo Title and is the subject of this lawsuit. Pursuant to the operating agreement, P.B. Surf was entitled to 100% of both sums of money.
“28. As a result of a dispute created by Defendant G.J. Willem Noltes during the closing on October 27, 2011, P.B. Surf, Savage, and Noltes, all acting through their counsel, agreed that, instead of wiring the Net Proceeds to a *704 particular person or entity, Defendant Alamo Title Company (the company that held approximately $2.3 million of the net proceeds from the sale) would inter-plead the Net Proceeds in Court in Texas so that the proper distribution of the net proceeds could be determined by a judge. Given the dispute over the distribution of the Net Proceeds, this agreement was required in order to close the sale of San Paloma. Absent this agreement, the sale would not have closed.
“29. All parties to the present dispute were in agreement with this proposed course of conduct and, as of the close of business on October 27, 2011, P.B. Surf had been informed and believed that the contemplated Texas in-terpleader would occur based on the parties’ agreement and written confirmation delivered to Alamo Title Company, coupled with Alamo’s consent to this arrangement and planned interpleader action.
“30. Unbeknownst to P.B. Surf, however, Savage and Noltes began immediately conspiring to seize control of the Net Proceeds before Alamo could inter-plead the funds into a Texas court. Savage and Noltes both admitted, under oath, that on the afternoon and evening of October 27, 2011, Savage and Noltes discussed ways by which they could obtain the Net Proceeds from Alamo and prevent P.B. Surf from obtaining any of the Net Proceeds. Savage and Noltes agreed to meet in Birmingham, Alabama on the following morning, October, 28, 2011, to determine how they could- instruct Alamo to wire the funds to an account controlled by Savage.

“October 28, 2011

“31. On the morning of October 28, 2011, without the knowledge or participation of P.B. Surf, Savage and Noltes accomplished their plan. On that morning, Noltes and Savage called Alamo, purporting to act on behalf of San Palo-ma Partners. Noltes and Savage first called Alamo by telephone and instructed Alamo to wire the funds into a Wells Fargo account in Birmingham, Alabama, which was in the name of San Paloma Partners, L.P. At that time, Savage was the only signatory on the bank account, but Noltes insisted later that morning at the Wells Fargo.bank branch that Savage add him as a signatory that day, which Savage did. Noltes and Savage confirmed their verbal instruction to Alamo in writing, via email, that same morning.
“32. Neither P.B. Surf, David Bran-nen, nor Patrick Hayes (attorney for both P.B. Surf and Savage) were copied on these October 28, 2011 correspondences from Savage and Noltes to Alamo, nor otherwise informed of the instructions given to Alamo. Savage and Noltes purposefully and admittedly concealed their actions from P.B. Surf, Brannen, and Hayes.
“33. That same morning, without consulting or notifying P.B. Surf, David Brannen or Patrick Hayes, Alamo wired the Net Proceeds to the Birmingham Wells Fargo account, to which only Savage and Noltes had access. Alamo had actual knowledge that P.B. Surf claimed an interest in these funds, as Attorney Patrick Hayes had informed Alamo, in writing, the previous day that the money was due to be paid to P.B. Surf. Alamo did not request either a certificate of incumbency or a formal letter from Savage or Noltes, nor, presumably, did Alamo consult with its counsel concerning Savage’s and Noltes’s instruction, despite the inconsistency of their instruction in light of the written agreement reached just one day earlier between all *705 of the parties. Nor did Alamo inform Patrick Hayes or Noltes’s attorney of the instructions given to it by Savage and Noltes that morning. Instead, based on a brief telephone call and email, Alamo simply wired the funds without informing P.B. Surf or its counsel of the instructions given to it by Savage and Noltes.
“34. Upon the deposit of the funds in the Wells Fargo account, Savage and Noltes immediately withdrew $2.1 million, the vast majority of the funds, depositing these funds in personal bank accounts outside the reach of P.B. Surf, and in some cases, later transferred the funds to bank accounts outside the jurisdiction of the United States.”
In its amended complaint, P.B. Surf sought injunctive and declaratory relief. In addition, the counts in the amended complaint alleged against Alamo (1) negligence, (2) wantonness, (3) breach of contract, (4) breach of fiduciary duty, (5) fraud, (6) conversion, and (7) conspiracy, among others. In particular, as to conspiracy, P.B. Surfs amended complaint avers, in pertinent part:

“COUNT IX: CONSPIRACY

“91. Defendants conspired among themselves to wrong, injure, damage, defraud and/or deceive P.B. Surf, and/or to convert the Net Proceeds.
“92. Defendants have taken action and committed acts in furtherance of said conspiracy or conspiracies to the detriment of P.B. Surf. These actions include, but are not limited to, the following:
“(a) Savage and Noltes instructing Alamo to wire the funds to the Wells Fargo account;
“(b) Alamo’s wiring of the money to the Wells Fargo account;
“(c) Noltes’s and Savage’s withdrawing the money from the Wells Fargo account;
“(d) Noltes’s and Savage’s transferring the money to personal accounts;
“(e) Noltes, Savage, Kent Suttles Noltes, Tamela Savage, Investment Realty, LLC, Power Force, LLC, and/or Power Force Apparel, LLC spending portions of the Net Proceeds on personal debts, liabilities, and/or investments or other matters unrelated to the San Paloma venture;
“(f) Savage, Noltes, Kent Suttles Noltes, Tamela Savage, Investment Realty, LLC, Power Force, LLC, and/or Power Force Apparel, LLC maintaining control of and/or withholding the money from P.B. Surf.
“93. Through their conspiracy, Defendants have caused P.B. Surf to suffer significant and continuous damage, injury, and loss.”
The amended complaint asserted that venue for the action was proper in Jefferson County, Alabama, because, it stated, “a substantial part of the events or omissions giving rise to the claim occurred in Jefferson County.”
Alamo filed a motion to dismiss P.B. Surfs amended complaint on the basis that the trial court lacked personal jurisdiction, both general and specific, over Alamo. See Rule 12(b)(2), Ala. R. Civ. P. Alamo also filed a supplement to its motion to dismiss. Attached to the supplement was the affidavit of Pitschmann. The affidavit stated:
“• Alamo has never conducted business, solicited business, or otherwise engaged in any persistent course of conduct within the State of Alabama;
“•Alamo has never been registered or qualified to do business in the State of *706 Alabama, and has never maintained a registered agent for service of process in the State of Alabama;
“• Alamo has never consented to personal jurisdiction in any courts in the State of Alabama, has never been a litigant in the courts of the State of Alabama, has never availed itself of the courts of the State of Alabama, has not received any financial or other benefits, privileges, subsidies, incentives, compensation, or protection from the State of Alabama, and has never paid any taxes in the State of Alabama;
“•Alamo has never had any offices or facilities of any kind located within the State of Alabama, and has never performed any services in the State of Alabama;
“•Alamo has never had any employees or agents within the State of Alabama;
“• Alamo has never had any interest in, has never used, and has never owned any real estate, personal property, or other assets, including any product or parts inventory, located in the State of Alabama;
“• Alamo has never maintained any telephones, computers or servers, fax machines, routers, or other electronic equipment in the State of Alabama;
“•Alamo has never had any bank accounts located within the State of Alabama, has never borrowed any money from any bank located within the State of Alabama, and has never applied for or guaranteed any loan from any bank located within the State of Alabama;
“•Alamo has never directed any marketing, advertising, demonstrations, or solicitations toward anyone in the State of Alabama;
“• Alamo has never met or communicated with P.B. Surf in Alabama or in relation to any Alabama transaction;
“•Alamo has never had any dealings of any kind with P.B. Surf in Alabama or in relation to any Alabama transaction;
“• Alamo has never traveled to the State of Alabama by means of any officer, director or agent in any way authorized to act or transact business; and
“•Alamo has never paid any taxes or fees in the State of Alabama; and
“•Alamo played no role in the division of the proceeds from the sale of the San Paloma apartments.”
Pitschmann’s affidavit also stated:
“5. Alamo did not conspire with any of the Defendants, or any other person or entity, to wrong, injure, damage, defraud, and/or deceive P.B. Surf, and/or to convert the ‘Net Proceeds,’ as P.B. Surf alleges in the Amended Complaint.
“6. Alamo did not stand to benefit in any way from the distribution of the Net Proceeds to San Paloma Partners, LLP (‘San Paloma Partners’), Guy Savage (‘Savage’), or Willem Noltes (‘Noltes’). It gained nothing from making the distribution.
“7. Alamo transferred the Net Proceeds to the proper entity at the proper bank account. The Net Proceeds were transferred to the seller San Paloma Partners’ bank account at Wells Fargo; the Wells Fargo bank account had been recently identified by Patrick Hayes, an attorney representing Savage and P.B. Surfs principal David Brannen during the closing, on the afternoon of October 27, 2011.
“8. Alamo properly followed Savage and Noltes’s instructions on the morning of October 28, 2011, which it was specifically authorized to do. Savage and Noltes instructed Alamo to distribute the Net Proceeds Alamo held to the Seller’s Wells Fargo bank account on the morning of October 28, 2011. Savage and Noltes had the power to do so *707 because they were officers of [IRS-II] and because they owned and controlled IRS-II’s managing member Investment Realty Holdings, LLC. As [P.B. Surf] alleges in its Amended Complaint, ‘[i]n February 2007, P.B. Surf and Investment Realty Holdings, LLC entered into an Operating Agreement to govern the operation of IRS-II. That agreement controls and governs the parties’ relationship with respect to all business matters as it relates to the operation of the San Paloma property, the sale of which forms the basis of the present dispute between the parties.’ ”
P.B. Surf filed a response to Alamo’s motion to dismiss. In that response, P.B. Surf argued that its complaint, which detailed the real-estate services provided and the disbursement of a portion of the proceeds to two of the sellers by transferring the funds to an Alabama bank account and asserted a claim of conspiracy, established personal jurisdiction. P.B. Surf did not file an affidavit or other evidence to substantiate the factual allegations in its complaint, but it did request the opportunity to conduct jurisdictional discovery “to determine Alamo’s contacts with Alabama and to challenge the affidavits of David Pitsch-mann that Alamo filed in support of its Motion to Dismiss and Supplement.”
On July 20, 2012, the trial court denied Alamo’s motions to dismiss P.B. Surfs amended complaint, stating:
“The Court is satisfied and does hereby find, among others, that the actions of [Alamo] in causing the electronic transfer of approximately $2.2 million net dollars from a Texas bank to an Alabama bank in direct contravention and violation of the agreement of the parties made during the closing of a real estate transaction handled by [Alamo] in Texas, ... was sufficient to satisfy the minimal contact doctrine and place the said ALAMO TITLE COMPANY on notice that it could reasonably anticipate being haled into Court in the State of Alabama by [P.B. Surf] who had made claim to the funds directly to the ALAMO TITLE COMPANY defendant during the said closing. Further, [Alamo] was on notice of the claims to the funds made by [P.B. Surf] and NOLTES and SAVAGE which led to the agreement that the funds would be interpled into Court in Texas for determination of the ownership and ultimate disposition of the same. But for the uncontroverted acts of the defendant, ALAMO TITLE COMPANY, it is more likely than not that these parties would not be before this Court today. ... [T]his Court hereby holds that it does possess the requisite jurisdiction over the defendant, ALAMO TITLE COMPANY.”
(Capitalization in original.) Alamo moved the trial court to reconsider, arguing that P.B. Surf had not met its evidentiary burden and that Alamo lacked sufficient contacts with Alabama to support a finding of personal jurisdiction on the basis of the conspiracy claim.[1] Alamo petitioned this Court for a writ of mandamus.

II. Standard of Review

A Rule 12(b)(2) motion tests the court’s exercise of personal jurisdiction over a defendant. See Rule 12(b), Ala. R. Civ. P. “ ‘[A] petition for a writ of mandamus is the proper device by which to challenge the denial of a motion to dismiss for lack of in personam jurisdiction.’ Ex parte Dill, Dill, Carr, Stonbraker & Hutchings, P.C., 866 So.2d 519, 525 (Ala. *708 2003).” Ex parte McNeese Title, LLC, 82 So.3d 670, 673 (Ala.2011). We review such a petition pursuant to the following standard of review:
“[1] “The writ of mandamus is a drastic and extraordinaiy writ, to be ‘issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court.’ Ex parte United Sen. Stations, Inc., 628 So.2d 501, 503 (Ala. 1993); see also Ex parte Ziglar, 669 So.2d 133, 134 (Ala.1995).” Ex parte Carter, [807 So.2d 534,] 536 [(Ala. 2001) ].’
“Ex paite McWilliams, 812 So.2d 318, 321 (Ala.2001).”
Ex parte Buflcin, 936 So.2d 1042, 1044 (Ala.2006). “ ‘An appellate court considers de novo a trial court’s judgment on a party’s motion to dismiss for lack of personal jurisdiction.’ ” Ex paite Lagrone, 839 So.2d 620, 623 (Ala.2002) (quoting Elliott v. Van Kleef, 830 So.2d 726, 729 (Ala.2002)). But see Allsopp v. Bolding, 86 So.3d 952, 957-58 (Ala.2011) (recognizing that deference is due to pertinent trial court factual findings to the extent those findings are based on evidence received ore tenus).
Additionally, the appropriate analysis and the parties’ respective eviden-tiary burdens on a personal-jurisdiction issue are well settled. “ ‘ “The plaintiff has the burden of proving that the trial court has personal jurisdiction over the defendant.” ’ ” Ex parte McNeese Title, 82 So.3d at 674 (quoting Ex parte Excelsior Fin., Inc., 42 So.3d 96, 103 (Ala.2010), quoting in turn J.C. Duke & Assocs. Gen. Contractors, Inc. v. West, 991 So.2d 194, 196 (Ala.2008)).
“ ‘ “ ‘In considering a Rule 12(b)(2), Ala. R. Civ. P., motion to dismiss for want of personal jurisdiction, a court must consider as true the allegations of the plaintiff’s complaint not controverted by the defendant’s affidavits, Robinson v. Giaiinarco & Bill, P.C., 74 F.3d 253 (11th Cir.1996), and Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829 (11th Cir.1990), and “where the plaintiffs complaint and the defendant’s affidavits conflict, the ... court must construe all reasonable inferences in favor of the plaintiff.” Robinson, 74 F.3d at 255 (quoting Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir.1990)).’ ”
“ ‘Wenger Tree Serv. v. Royal Truck & Equip., Inc., 853 So.2d 888, 894 (Ala.2002) (quoting Ex paite Mclnnis, 820 So.2d 795, 798 (Ala.2001)). However, if the defendant makes a prima facie evidentially showing that the Court has no personal jurisdiction, “the plaintiff is then required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and he may not merely reiterate the factual allegations in the complaint.” Mercantile Capital, LP v. Federal Transtel, Inc., 193 F.Supp.2d 1243, 1247 (N.D.Ala.2002) (citing Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1249 (11th Cir.2000)). See also Hansen v. Neumueller GmbH, 163 F.R.D. 471, 474-75 (D.Del. 1995) (“When a defendant files a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(2), and supports that motion with affidavits, plaintiff is required to controvert those affidavits with his own affidavits or other competent evidence in order to survive the motion.”) (citing Time Share Vacation *709 Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir.1984)).’
“Ex parte Covington Pike Dodge, Inc., 904 So.2d 226, 229-30 (Ala.2004).”
Ex parte Excelsior Fin., Inc., 42 So.3d at 103.

III. Analysis

Alamo essentially makes two arguments for the trial court’s lack of personal jurisdiction over it. First, Alamo argues that it showed that the trial court lacked both general and specific jurisdiction over it and that P.B. Surf did not satisfy its burden of substantiating the jurisdictional allegations of its complaint. In particular, Alamo contends that it is a Texas corporation with no offices, employees, or business operations in Alabama and that its only contact with Alabama came when two defendants in this case, Savage and Noltes, contacted an Alamo employee and, as authorized representatives of the seller, instructed Alamo to wire approximately $2.2 million in sale proceeds to the seller’s bank account in Alabama. Alamo argues that this limited one-time transaction and its nominal contact with Alabama are insufficient to satisfy the due-process requirements of the Constitution and to justify an Alabama court’s exercising personal jurisdiction over it. Second, Alamo argues that P.B. Surfs conspiracy allegations in its amended complaint are insufficient to establish jurisdiction. Alamo denies that it was a part of any conspiracy when it instructed its bank to wire the net proceeds in its possession to the Wells Fargo account in Alabama owned by the seller, San Paloma Partners. We consider these arguments in turn.
Rule 4.2(b), Ala. R. Civ. P., permits Alabama courts to exercise personal jurisdiction over an out-of-state defendant. It provides, in pertinent part, as follows: “(b) Basis for Out-of-State Service. An appropriate basis exists for service of process outside of this state upon a person or entity in any action in this state when the person or entity has such contacts with this state that the prosecution of the action against the person or entity in this state is not inconsistent with the constitution of this state or the Constitution of the United States .... ”
Regarding Rule 4.2(b), this Court has said:
“In accordance with the plain language of Rule 4.2, both before and after the 2004 amendment, Alabama’s long-arm rule consistently has been interpreted by this Court to extend the jurisdiction of Alabama courts to the permissible limits of due process. Duke v. Young, 496 So.2d 37 (Ala.1986); DeSota-cho, Inc. v. Valnit Indus., Inc., 350 So.2d 447 (Ala.1977). As this Court reiterated in Ex parte Mclnnis, 820 So.2d 795, 802 (Ala.2001) (quoting Sudduth v. Howard, 646 So.2d 664, 667 (Ala.1994)), and even more recently in Hiller Investments Inc. v. Insultech Group, Inc., 957 So.2d 1111, 1115 (Ala.2006): ‘Rule Jh2, Ala. R. Civ. P., extends the personal jurisdiction of the Alabama courts to the limit of due process under the federal and state constitutions.’ (Emphasis added.)”
Ex parte DBI, Inc., 23 So.3d 635, 643 (Ala.2009). See also Ex parte McNeese Title, 82 So.3d at 673.
“ ‘Two types of contacts can form a basis for personal jurisdiction: general contacts and specific contacts. General contacts, which give rise to general personal jurisdiction, consist of the defendant’s contacts with the forum state that are unrelated to the cause of action and that are both “continuous and systematic.” Helicópteros Nacionales de Colombia, S.A v. Hall, 466 U.S. 408, 414 n. 9, 415, 104 S.Ct. *710 1868, 80 L.Ed.2d 404 (1984); [citations omitted]. Specific contacts, which give rise to specific jurisdiction, consist of the defendant’s contacts with the forum state that are related to the cause of action. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Although the related contacts need not be continuous and systematic, they must rise to such a level as to cause the defendant to anticipate being haled into court in the forum state. Id.’
“Ex parte Phase III Constr., Inc., 723 So.2d 1263, 1266 (Aia.1998) (Lyons, J., concurring in the result). Furthermore, this Court has held that, for specific in personam jurisdiction, there must exist ‘a clear, firm nexus between the acts of the defendant and the consequences complained of.’ Duke v. Young, 496 So.2d 37, 39 (Ala.1986). See also Ex parte Kamilewicz, 700 So.2d 340, 345 n. 2 (Ala.1997).
“In the case of either géneral in per-sonam jurisdiction or specific in person-am jurisdiction, ‘[t]he “substantial connection” between the defendant and the forum state necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State.’ Asahi Metal Indus. Co. v. Superior CouH of California, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). This purposeful-availment requirement assures that a defendant will not be'haled into a jurisdiction as a result of ‘ “the unilateral activity of another person or a third person.” ’ Burger King, 471 U.S. at 475, 105 S.Ct. 2174, quoting Helicópteros Na-cionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417,104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).
“Only after such minimum contacts have been established does a court then consider those contacts in the light of other factors — such as the burden on the defendant of litigating in the forum state and the forum state’s interest in adjudicating the dispute, Burger King, 471 U.S. at 476-77,105 S.Ct. 2174 — to determine whether the exercise of personal jurisdiction over the nonresident defendant comports with ‘ “traditional notions of fair play and substantial justice.” ’ Brooks v. Inlow, 453 So.2d 349, 351 (Ala. 1984), quoting International Shoe [Co. v. Washington ], 326 U.S. [310] at 316, 66 S.Ct. 154 [ (1945) ]. See also Burger King, 471 U.S. at 476-77, 105 S.Ct. 2174.”
Elliott v. Van Kleef 830 So.2d at 730-31.
A defendant is constitutionally amenable to a forum’s specific jurisdiction if it possesses sufficient minimum contacts with the forum to satisfy due-process requirements and if the forum’s exercise of jurisdiction comports with “ ‘traditional notions of fair play and substantial justice.’ ” International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). See Ex parte Kohlberg Kravis Roberts & Co., 78 So.3d 959, 972 (Ala.2011) (quoting Ex parte Mclnnis, 820 So.2d 795, 802-03 (2001)). This two-part test embodies the controlling due-process principle that a defendant must have “fair warning” that a particular activity may subject it to the jurisdiction of a foreign sovereign. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). See Ex parte Kohlberg Kravis Roberts & Co., 78 So.3d at 970.
We first consider Alamo’s contention that the trial court lacked both general and specific jurisdiction over it. In response to Alamo’s argument, P.B. Surf acknowledges that the trial court lacked *711 general jurisdiction over Alamo.[2] The issue before this Court, therefore, is one of specific, not general, personal jurisdiction.
Over the course of the development of minimum-contacts analysis following International Shoe Co. and its progeny, this Court, in Elliott v. Van Kleef, supra, and its progeny, has essentially formulated a test for ascertaining whether there are sufficient minimum contacts for a court to exercise specific personal jurisdiction over a nonresident defendant: (1) The nonresident defendant’s contacts must be related to the plaintiffs cause of action or have given rise to it. Ex parte Kohlberg Kravis Roberts & Co., 78 So.3d at 971 (citing Burger King Corp. v. Rudzewicz, 471 U.S. at 472). (2) By its contacts the nonresident defendant must have purposefully availed itself of the privilege of conducting business in the forum state.[3] Ex parte City Boy’s Tire & Brake, Inc., 87 So.3d 521, 529 (Ala.2011). See Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); see also Burger King, 471 U.S. at 474-75. (3) The nonresident defendant’s contacts with the forum must be “such that the nonresident defendant ‘“should reasonably anticipate being haled into court” ’ in the forum state.” Ex parte Excelsior Fin., Inc., 42 So.3d at 101 (quoting Burger King Corp., 471 U.S. at 473, quoting in turn Worldr-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). See, e.g., Elliott v. Van Kleef, supra.
Considering the minimum-contacts analysis in the context of specific personal jurisdiction, this Court concludes that the requisite minimum contacts for the trial court’s exercise of specific jurisdiction over Alamo do not exist. First, the allegations in the amended complaint and the evidence before the court establish that, as a result of the Alamo’s performance as escrow agent in the underlying transaction, Alamo had telephone and electronic-mail communications with Savage and Noltes. Alamo, at the direction of Savage and Noltes, two of several sellers, wired sale proceeds from its bank account in Texas to a bank ac *712 count in Alabama. AJI these contacts with Alabama were for the purpose of completing the real-estate transaction at issue and form the predicate of P.B. Surfs cause of action. Therefore, the first prong of the minimum-contacts analysis for specific personal jurisdiction is satisfied because Alamo’s contacts with Alabama are related to P.B. Surfs cause of action.
However, P.B. Surfs assertion of personal jurisdiction fails when the second prong of the minimum-contacts analysis is considered. “The issue of personal jurisdiction ‘ “stands or falls on the unique facts of [each] case.” ’ ” Ex parte Citizens Prop. Ins. Corp., 15 So.3d 511, 515 (Ala.2009) (quoting Ex parte I.M.C., Inc., 485 So.2d 724, 725 (Ala.1986)). The evidence before this Court gives no indication that Alamo “purposefully availed” itself of the protection of the laws of Alabama or that it should reasonably have expected to be haled into court here. As previously noted, Alamo had virtually no contact with Alabama other than telephone and electronic-mail communications and the wiring of funds from the Texas bank account to the Alabama bank account in relation to the real-estate transaction. See, e.g., Elliott v. Van Kleef, 830 So.2d at 731 (“[T]he telephone calls, fax transmissions, and letters from Kizer and Elliott to Van Kleef are irrelevant to whether personal jurisdiction over Van Kleef exists, because these calls and faxes were ‘the unilateral activity of another person.’ ” (quoting Burger King Coij)., 471 U.S. at 475)), and Kittle Heavy Hauling v. Gary A. Rubel, Inc., 647 So.2d 743, 744 (Ala.Civ.App.1994) (“The use of an interstate facility (i.e., telephone) is an ancillary factor and does not, alone, provide the requisite minimum contacts.”). See also Ex parte No. 1 Steel Prods., Inc., 76 So.3d 805, 812 (Ala.2011) (“We have in previous cases explicitly recognized that a one-time contract for the purchase of goods is an insufficient basis for jurisdiction.”); Vista Land & Equip., L.L.C. v. Computer Programs & Sys., Inc., 953 So.2d 1170, 1177 (Ala.2006) (“[0]ur caselaw does not authorize the exercise of personal jurisdiction over a nonresident defendant solely on the basis of contracts it may have entered into with Alabama parties; rather, such jurisdiction is authorized when there is an ongoing contractual relationship supported by the additional contacts that are incidental to such a relationship.”). Alamo is not incorporated, licensed, registered, or authorized to do business in Alabama. Alamo does not have offices, agents, or bank accounts in Alabama, nor does it have officers or employees located in Alabama. There is no evidence indicating that any Alamo employee traveled to Alabama in connection with this transaction. Moreover, there is simply no evidence indicating that Alamo initiated any contact whatsoever with Alabama concerning the real-estate transaction at issue. The evidence establishes that Alamo was contacted in Texas by Savage and Noltes, two of the sellers involved in this transaction, who contacted Alamo from Alabama. Further, none of the closing documents were executed in or delivered to Alabama, the escrow funds were not held in Alabama, the real property was not sold to a purchaser in Alabama, and the real-estate transaction was not closed in Alabama. Finally, the real property, the San Paloma apartment complex, was located in Texas, not Alabama. Cf. Bowling v. Founders Title Co., 773 F.2d 1175 (11th Cir.1985) (finding that Alabama had personal jurisdiction over a California defendant who made misrepresentations by telephone and mail to an Alabama plaintiff regarding a transaction the out-of-state defendant knew involved the sale of land located in Alabama).
*713 Alabama courts have recognized that, in an appropriate case, specific jurisdiction can be based upon the purposeful conspiratorial activity of a nonresident defendant aimed at an Alabama plaintiff. See Ex parte Reindel, 963 So.2d 614, 622-24 (Ala.2007), and Ex parte Barton, 976 So.2d 438, 443^4 (Ala.2007). To establish personal jurisdiction under a conspiracy theory, “ ‘the plaintiff must plead with particularity “the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy.” ’ ” Ex parte Mclnnis, 820 So.2d at 806-07 (quoting Jungquist v. Sheikh Sultan Bin Khali-fa Al Nahyan, 115 F.3d 1020, 1031 (D.C.Cir.1997)). The elements of civil conspiracy in Alabama are: (1) concerted action by two or more persons (2) to achieve an unlawful purpose or a lawful purpose by unlawful means. Luck v. Primus Auto. Fin. Servs., Inc., 763 So.2d 243, 247 (Ala. 2000).
“ ‘ “[I]f the defendant makes a pri-ma facie evidentiary showing that the Court has no personal jurisdiction, ‘the plaintiff is then required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and he may not merely reiterate the factual allegations in the complaint.’ Mercantile Capital, LP v. Federal Transtel, Inc., 193 F.Supp.2d 1243, 1247 (N.D.Ala.2002) (citing Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1249 (11th Cir.2000)). See also Hansen v. Neumueller GmbH, 163 F.R.D. 471, 474-75 (D.Del.1995) (‘When a defendant files a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) [i.e., for lack of personal jurisdiction], and supports that motion with affidavits, plaintiff is required to controvert those affidavits with his own affidavits or other competent evidence in order to survive the motion.’)(citing Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir.1984)).”
“ Ex parte Covington Pike Dodge, Inc., 904 So.2d 226, 229-30 (Ala.2004) (footnote omitted).’
“Ex parte Unitrin, Inc., 920 So.2d 557, 560-61 (Ala.2005).”
Ex parte United Ins. Cos., 936 So.2d 1049, 1053-54 (Ala.2006). See also Ex parte Excelsior Fin., Inc., 42 So.3d at 101.
P.B. Surfs complaint, as amended, alleges that Alamo was a part of the conspiracy because it wired the net proceeds of the sale into an Alabama bank account. In support of its motion to dismiss, Alamo submitted an affidavit stating (1) that “Alamo did not conspire with any of the defendants, or any other person or entity, to wrong, injure, damage, defraud, and/or deceive P.B. Surf, and/or to convert the ‘Net Proceeds’ (2) that Alamo followed Savage’s and Noltes’s direction on the morning of October 28, 2011, who, as sellers, had the authority to instruct Alamo; (3) that Alamo transferred the net proceeds from the real-estate closing to the proper entity at the proper bank account; (4) that the Wells Fargo bank account had been recently identified by Patrick Hayes, an attorney representing Savage and P.B. Surfs principal David Brannen during the closing, on the afternoon of October 27, 2011; and (5) that Alamo did not stand to benefit in any way from the distribution of the net proceeds to San Paloma Partners, L.P., Savage, or Noltes. This affidavit testimony was sufficient to shift the burden to P.B. Surf to present evidence substantiating that jurisdiction existed over Alamo under a conspiracy theory. See Excelsior Fin., 42 So.3d at 103; Ex parte Covington Pike Dodge, 904 So.2d 226, 229-30 (Ala.2004). However, P.B. Surf did not submit any *714 affidavits or other evidence to rebut the prima facie showing made by Alamo. Consequently, we conclude that the trial court erred in denying Alamo’s motion to dismiss the action against it for lack of personal jurisdiction. Thus, Alamo’s petition for a writ of mandamus establishes a clear legal right to the. dismissal of the complaint as to it to the extent that personal jurisdiction was alleged in the complaint to have been based upon a civil conspiracy.
Considering the quality, nature, and extent of Alamo’s contacts with Alabama, as well as the association between those contacts and the instant litigation, this Court finds that none of Alamo’s contacts with Alabama can support a finding of purposeful activity invoking the benefits and protections of Alabama courts. Although Alamo’s contacts were tangentially related to Alabama, this Court finds that the “ ‘nature and quality and the circumstances of their commission’ create only an ‘attenuated’ affiliation with” Alabama. Burger King Corp., 471 U.S. at 476 n. 18 (citations omitted).
In sum, P.B. Surf has acknowledged that Alamo’s contacts with Alabama were not continuous and systematic so as to support the trial court’s exercise of general personal jurisdiction over Alabama. This Court concludes, based on an analysis of minimum-contacts factors, that the trial court’s exercise of- specific personal jurisdiction over -Alamo is also unsupported. Therefore, the petition for a writ of mandamus filed by Alamo establishes a clear legal right to the dismissal of the complaint on the basis that the trial court lacked personal jurisdiction over it.

IV. Conclusion

For the reasons set out above, we grant the petition for the writ of mandamus and direct the trial court to vacate its order denying Alamo’s motion to dismiss and to enter an order dismissing P.B. Surfs claims against Alamo on the basis that it lacks personal jurisdiction.
PETITION GRANTED; WRIT ISSUED.
STUART, BOLIN, PARKER, WISE, and BRYAN, JJ., concur.
MURDOCK, J., concurs specially.
MOORE, C.J., dissents.

. Alamo states that, as of the filing of its mandamus petition, the trial court had not ruled on its motion to reconsider.

. In addition, the relevant evidence submitted by Alamo in Pitschmann's affidavits does not support a finding of general personal jurisdiction.

. In Burger King Corp., the United States Supreme Court explained that to be purposeful, the out-of-state defendant’s contacts with the forum state must be deliberate and substantial, rather than accidental or random:
"This 'purposeful availment’ requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of ‘random,’ 'fortuitous,' or 'attenuated' contacts, Keeton v. Hustler Magazine, Inc., 465 U.S. [770], at 774 [(1984)]; World-Wide Volkswagen Corp. v. Woodson, 444 U.S. [286,] 299 [(1980)], or of the 'unilateral activity of another party or a third person,’ Heli-cópteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. [408,] 417 [(1984)]. Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a 'substantial connection’ with the forum State. McGee v. International Life Insurance Co., 355 U.S. [220], 223 [ (1957) ]; see also Kulko v. California Superior Court, supra, 436 U.S. [84], 94 [(1978) ]. Thus where the defendant 'deliberately' has engaged in significant activities within a State, Keeton v. Hustler Magazine, Inc., supra, 465 U.S., at 781, or has created 'continuing obligations’ between himself and residents of the forum, Travelers Health Assn. v. Virginia, 339 U.S. [643], at 648 [(1950)], he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by ‘the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.”
471 U.S. at 475-76 (footnote omitted).